724 F.Supp. 50 (1989)
NATURAL ORGANICS, INC., Plaintiff,
v.
PROTEINS PLUS, INC., Defendant.
No. CV 89-2179.
United States District Court, E.D. New York.
September 19, 1989.
Bass & Ullman, New York City, for plaintiff; I. Scott Bass, of counsel.
Morahan & Coppola, Livingston, N.J., for defendant; Peter Frederick Williams, of counsel.

MEMORANDUM OF DECISION
MISHLER, District Judge.
Natural Organics, Inc. ("N.O.") moves for a mandatory preliminary injunction directing Proteins Plus, Inc. ("P.P.") to continue "to supply plaintiff with the Spiru-Tein product in quantities equal to those furnished in June and July 1989 and ... to provide plaintiff with the true and actual formulation, including a release of flavor formula to plaintiff."
The court conducted an evidentiary hearing. The court finds:

The Complaint
The complaint states a claim for breach of contract and fraud in denying the plaintiff its trade secret, i.e., formulas for the production of a protein supplement sold under the name Spiru-Tein. Plaintiff seeks damages and injunctive relief.

The Parties
N.O. has been engaged in the business of selling vitamins, minerals, and food supplements to natural food stores since 1972. At the present time it sells to approximately 4,000 to 5,000 stores throughout the continental United States. It sells approximately 500 different products. N.O.'s line of vitamins, minerals, and food supplements are manufactured by others under its specifications and sold and distributed under its trademark NATURE'S PLUS.
P.P. is engaged in the business of manufacturing products for sale and distribution by others. In 1985, P.P. manufactured about ten different products in the natural food industry for N.O., which in turn N.O. sold and distributed nationwide under its trademark NATURE'S PLUS.

History of the Formulation of SPIRUTEIN
In or about April 1985, Ms. Marci Dunnder, vice-president of N.O. in charge of marketing and new product research and development, *51 decided that there was a market, consisting of vegetarians and consumers who were on protein deficient diets, for a protein supplement. At or about that time she discussed the development of the new product with Robert Semar, owner and vice-president of P.P.
On August 1, 1985, Ms. Dunnder mailed specifications "for a powdered protein supplement" to Semar. (Ex. 26). In addition to listing the ingredients, the specifications described the type of ingredient listed. With an eye to market acceptance, the specifications also included the following "Guidelines for a Protein Supplement":
Great Taste
VegetarianSoy Protein Isolate
Instant
Serving Size 20 grams (2 heaping tablespoons)
Carbohydrates 0
Fat 0
Caloriesapproximately 75
Minimum 80% protein
FlavorVanillaSweetened w/Fructose if necessary
The letter asked Semar to submit a sample based on the specifications and estimated "a 10,000 can run."
P.P. submitted samples of the product, which was called Spiru-Tein, over the next three or four months to Dunnder, who would taste and test the sample for its nutritional value and acceptance in the marketplace. Dunnder received 20 to 50 samples from P.P. over the period. She made various changes relating to the proportion of the ingredients. At times Semar made suggestions. Dunnder's decision was final as to any change in the formula.
Production by P.P. on the formula based on Dunnder's specifications and modifications started in the latter part of 1985. In accordance with N.O.'s requirements, P.P. provided N.O. with the 10,000 one-pound cans of the product during the balance of 1985. N.O. labelled the cans under the tradename NATURE'S PLUS SPIRU-TEIN and distributed it to its customers.

Market Acceptance and the May 14, 1987 Agreement
The response to Spiru-Tein was favorable and immediate. The demand for Spiru-Tein increased through 1986 and into 1987.
With the prospect of increased demand for Spiru-Tein, N.O. sought assurance from P.P. that the latter could supply its needs. It was N.O.'s practice and policy to keep a six-month supply of its product in inventory. P.P. was aware of this policy and also of N.O.'s policy of shipping orders for merchandise to its customers within twenty-four hours of the receipt of the orders.
In April 1987, Dunnder advised Semar of N.O.'s concerns that it have enough Spiru-Tein to meet its needs and that N.O. insisted on a written document to set forth the obligations of the parties. She told Semar that N.O. insisted on physical possession of the formula.
Dunnder typed a proposed agreement and mailed it to Semar. It was not returned immediately. Dunnder called Semar concerning execution of the agreement and was advised by Semar that it was being reviewed by their lawyer, Peter F. Williams. (Mr. Williams is the attorney of record in this litigation. He is a director of P.P.). Dunnder made changes in the proposed agreement requested by Semar on Williams's advice. The document was signed by Dunnder (Schram) and mailed to Semar. Semar signed the agreement on behalf of P.P. and dated it May 14, 1987. (Ex. 3). The agreement is appended to this memorandum of decision.
The agreement covered all products manufactured by P.P. for sale and distribution by N.O. The reason for entering into the agreement was N.O.'s concern involving P.P.'s ability to meet the increased demand for Spiru-Tein and N.O.'s insistence in defining the obligations of the parties.

Events Following Execution of the May 14, 1987 Agreement
The parties understood that the formulas for the flavors then being produced would be turned over to N.O. upon execution of the agreement. (Tr. at 380-81). A few days after the signing of the agreement, Semar sent Dunnder the so-called original and chocolate flavor formulas. Subsequently, *52 as Dunnder developed strawberry and banana flavors, the formulas were turned over to Dunnder. However, Semar "blocked" the flavors used in the formulas,[1] and N.O.'s knowledge of the formulas without access to the flavors was useless. Semar engaged in this fraud to assure P.P. of continuing business from N.O. because Semar believed P.P. would be the only source of supply of Spiru-Tein.[2]
The protein used in the formula was Profam 646, a product of Archer Daniels Midland ("ADM"). In April 1988, P.P. substituted another protein powder without N.O.'s consent. Approximately 70,000 cans were shipped to N.O., who in turn labelled the cans NATURE'S PLUS SPIRU-TEIN and shipped them to its customers. The product settled in the can and was gritty and, thus, unacceptable to the consumer. After receiving numerous complaints, N.O. recalled the product. The value of the good will that was created in N.O.'s sponsorship of Spiru-Tein was impaired.
On April 18, 1988, Semar wrote Gerald Kessler, president of N.O.:
It is our intention to manufacture your power products in the future with no deviation from approved controls. If our vendors back order product I will issue alternative samples and let Natural Organics decide on the appropriate course of action.
Proteins Plus, Inc. will issue samples of batches from all future orders and will not release a shipment without Natural Organics prior approval. (Ex. 9).
N.O.'s effort to maintain the volume of increased business (despite the setback in April 1988) met supply problems from P.P. Whereas orders were normally shipped to N.O. within six weeks from the date of receipt of the order, the period for delivery was extended, beginning with mid-1988, three to four months. As a result, N.O.'s inventory of Spiru-Tein dwindled to about a one-month supply by the end of 1988.
Semar attributes the failure to supply N.O., in part, to the difficulty in obtaining Profam 646. ADM, P.P.'s source of Profam 646, had advised Semar in August 1988 that ADM was moving its processing plant and would inventory Profam 646 based on its customers' needs. Ingrid Cravens, export sales manager of ADM, advised Semar in or about the end of August 1988 that Profam 646 would be available to P.P. if he advised ADM of his requirements. (See deposition, Ex. 32).[3] Semar failed to respond to this request and, therefore, Profam 646 was not available to P.P. for the rest of 1988 and 1989.
In September 1988, N.O. decided to embark on an extensive program to promote Spiru-Tein, advised Semar of its plan and told him that sales of the product could treble. The promotion kickoff was scheduled with a meeting of N.O.'s twenty salesmen in January 1989. Prior to the meeting Semar telephoned Dunnder and advised her that he was out of Profam 646 because he failed to heed ADM's warning in August 1988.
Semar was successful in procuring a substitute for Profam 646 in Ralston-Purina's Sapro 670. Sensing the probability that N.O. would exercise its right to manufacture Spiru-Tein to the extent that P.P. was *53 unable to meet N.O.'s requirements, and the possible loss of business to P.P., Semar gave N.O. false formulas for making Spiru-Tein with the newly acquired protein. When testing the formulas revealed the deception to N.O., Dunnder called Semar. When Dunnder demanded the true formula, Semar advised her he would have to speak to Mr. Williams, his lawyer.
By March 1989, P.P. was hopelessly behind in filling N.O.'s orders for Spiru-Tein (See Ex. 28). In order to eliminate any confusion as to what orders were pending, the parties agreed to cancel all unfilled prior orders and N.O. placed with P.P. a "consolidated" order of 115,000 cans.
In May 1989, N.O.'s inventory further dwindled to a supply of two weeks' to a month. At times it was unable to supply Spiru-Tein to customers. N.O. decided to set a plant to manufacture and can Spiru-Tein. N.O. leased premises and purchased equipment and raw materials, costing between $260,000 and $270,000. N.O. was unable to proceed with the planned manufacture of Spiru-Tein because it still did not have the true formula and/or the precise flavor P.P. used in the product. N.O. thereupon, on June 23, 1989, placed an order with P.P. for 224,000 cans of Spiru-Tein (approximately $500,000) (Ex. 16). Williams wrote N.O. advising that it would take four to six months for delivery and the order would be accepted only if N.O. would pay in advance for the raw materials. P.P. then advised N.O. that Williams suggested N.O. "make this ourselves."
At P.P.'s request no orders have been placed since the June 23, 1989 order (which was cancelled). P.P. has delivered Spiru-Tein to N.O. on unfilled orders placed prior to June 1989. At the time of the hearing, N.O.'s inventory consisted of about a two weeks' supply.

DISCUSSION

Ownership of the Trade Secret
P.P. claims it owns the trade secret, i.e., the formulas. P.P. did not claim ownership of the trade secret until May 1989, when it was conceded by P.P. that it could not supply N.O.'s requirements.
We turn to the agreement of May 14, 1987 in determining ownership. (Ex. 3). It was the intent of the parties that N.O.'s ownership be confirmed. The obligation to turn over the formulas to N.O. (Par. 1) and the statement "the formulations developed by Natural Organics" clearly shows N.O.'s ownership.
We go beyond the agreement to support the determination found in the agreement and consider the following factors:
(1) The idea originated with N.O. based on its knowledge of the potential demand of the marketplace.
(2) The formula was perfected solely through N.O.'s listed specifications and its approval of the various changes and modifications during the development of the formula.
(3) N.O. took all reasonable means to maintain the secrecy of the formulas. The success of the product and the predictable increase in sales is because the secrecy of the formula gives N.O. a competitive advantage over those in the natural food industry.[4]
(4) N.O. spent large sums and planned to spend millions of dollars gaining consumer acceptance of Spiru-Tein.

N.O.'s Rights in the Use of the Formulas
At least from mid-1988, P.P. was unable to supply N.O. with N.O.'s requirements of Spiru-Tein and such failure continues to the present time.

The Standard for Granting Injunctive Relief
"The standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping *54 decidedly toward the party requesting the preliminary relief." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979).
We are aware that when mandatory injunctive relief is sought, i.e., relief that disturbs "the status quo by ordering affirmative relief, as opposed to prohibitory injunctions which preserve the status quo," Eng v. Smith, 849 F.2d 80, 82 (2d Cir.1988) citing Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir.1985), a heightened standard is applied. Since the injunctive relief requested includes a direction for turning over the information relating to flavors, and the status quo may further be disturbed by authorization permitting N.O. to commence production of Spiru-Tein, we apply the heightened standard.
We find by clear and convincing evidence that N.O. will succeed on the merits. We further find that if injunctive relief is denied N.O. will lose its present market for Spiru-Tein. Competitors are beginning to market protein supplements and N.O. will lose the advantage in being an early starter (or indeed, the first) in the market. N.O.'s reputation as a reliable quality merchandiser will be seriously impaired.

CONCLUSION
The motion for a preliminary injunction is granted.
N.O. shall file a bond in the amount of $25,000 pursuant to Fed.R.Civ.P. 65(c).
This memorandum of decision contains findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

APPENDIX

Agreement Between

Natural Organics, Inc.

10 Daniel Street

Farmingdale, NY 11735

and

Proteins Plus, Inc.

4 Madison Road

Fairfield, NJ 07066
RE: Product formulations developed by Proteins Plus, Inc. for Natural Organics, Inc. or any of its divisions and for distribution by Natural Organics, Inc. or any of its divisions.
1) Proteins Plus, Inc. will make available for Natural Organics, Inc. records of the formulations and suppliers of raw materials for any product developed by Proteins Plus, Inc. for distribution by Natural Organics, Inc.
2) Providing that Proteins Plus, Inc. can continue to supply Natural Organics, Inc. with all products formulated by Proteins Plus, Inc., substantiating any reasonable price increases which may arise, Natural Organics, Inc. agrees to continue to purchase such products only from Proteins Plus, Inc., and will not manufacture any such products in our own plant or by any other outside supplier.
3) Proteins Plus, Inc. agrees to keep the formulations developed by Natural Organics, Inc. in the strictest confidence and agrees not to duplicate any formulations for any other customer.
 (s) Marci Schram
 NATURAL ORGANICS, INC.
 Marci Schram
 Vice President
 (s) Bob Semar 5/14/87
 PROTEINS PLUS
 Bob Semar
 V.P.
NOTES
[1] "Blocking" of the flavors was a device employed by Semar in which the flavors used in the formula were designated by code numbers and supplied only to P.P.
[2] Semar testified with regard to turning over the formulas:

A. It was a business decision. I thought that if we did not send the formulas that we would lose the Spiru-Tein business. I had a lot of product in inventory that I could not sell to anybody else and I made a business decision to send the formulas and put a block in. (Tr. p. 390).
[3] P.P.'s counsel was not present at the taking of Ms. Cravens's testimony and objects to its admission in evidence. Although the defendant received only one-day notice, the parties were on an expedited discovery schedule, the need for her deposition was sudden and unexpected, and her deposition was brief and taken by phone. We find that the defendant received notice "reasonable under all the circumstances." Radio Corp. of America v. Rauland, 21 F.R.D. 113, 124 (N.D.Ill.1957) and that the deposition is admissible pursuant to Federal Rule of Civil Procedure 32. See also Hart v. United States, 772 F.2d 285, 286 (6th Cir.1985); F.A.A. v. Landy, 705 F.2d 624, 634-35 (2d Cir.1983); Mims v. Central Manufacturers' Mutual Insurance Co., 178 F.2d 56, 59 (5th Cir.1949); Lloyd v. Cessna Aircraft Co., 430 F.Supp. 25 (E.D.Tenn.1976).
[4] We note that under the contract of May 14, 1987, P.P. is required to keep the formulas "in the strictest confidence and agrees not to duplicate any formulations for any other customer." The limitation on N.O.'s use of the formulas exists only so long as P.P. "can continue to supply Natural Organics, Inc. with all products formulated by Proteins Plus, Inc." (Par. 2).